ARKANSAS PHARMACISTS ASSOCIATION
et al *v.* DIVISION OF SOCIAL SERVICES OF
THE DEPARTMENT OF HUMAN SERVICES
OF THE STATE OF ARKANSAS

78-178                                              574 S.W. 2d 644

Opinion delivered November 20, 1978
(In Banc)
[As Amended on Denial of Rehearing January 12, 1979.]

*Friday, Eldredge & Clark,* by: *George Pike, Jr.,* for appellants.

*Ivan H. Smith,* for appellee.

DARRELL HICKMAN, Justice. The Arkansas Pharmacists Association and one individual pharmacist sued the Division of Social Services of the Department of Human Services of the State of Arkansas challenging procedures and payments to certain pharmacists who are entitled to reimbursement for dispensing prescriptions as part of the Medicaid Prescription Drug Program.

The Arkansas General Assembly, by Act 492 of 1977, authorized continuation of such a program, set forth the fees that could be paid under such a program, and authorized the Commissioner of Social Services to set the fees according to certain criterion.

Ray Scott, the Commissioner of Social Services, was authorizing a fee of $2.50 at the time the Act was passed in March of 1977. In June of 1977, he authorized by emergency order an increase to $2.70, effective July 1, 1977. Commis-

sioner Scott conducted a public hearing on August 10, 1977 and decided, after hearing evidence, that the fee should remain at $2.70. On February 17, 1978, a public hearing was held by Commissioner Yarborough, Scott's successor, reviewing the findings of Commissioner Scott, and also considering other evidence regarding the fee. Yarborough determined that the $2.70 authorized in August was properly made. Commissioner Yarborough determined that an increase would be authorized effective March 18, 1978 to $2.87. It was undisputed that an additional seventeen cents would be in order due to the increase in the cost of living index, therefore, the Commissioner authorized the fee to be increased to $2.87.

The pharmacists contend that it was the intention of the Arkansas General Assembly to authorize no less than $3.00 from the Act's inception in March of 1977, and that an annual adjustment in March of 1978 would authorize the pharmacists to receive $3.17.

In the alternative the pharmacists argue that if the Act does not require payment of $3.00, then the Commissioner was wrong in setting the amount of the fee according to guidelines set forth in the Act and that $3.00 should have been paid from the inception of this Act.

Social Services argues that the Act only authorizes a maximum payment of $3.00 at any time and that the Commissioner's rulings were not arbitrary and unreasonable but were, in fact, based upon substantial evidence and that the appellants' claim should fail in all respects.

The Circuit Court of Pulaski County, where this lawsuit was originally filed, reviewed the Commissioner's findings which were made on March 3, 1978, after the February hearing, and determined that those findings were essentially correct. That is, that the Commissioner was not authorized at any time to pay more than $3.00 for each prescription; that Commissioner Scott had a reasonable basis for setting the fee in August of 1977 at $2.70; and, that the Commissioner had a reasonable basis for setting the fee at $2.87, effective March 18, 1978. We agree with the trial court and the Commissioner that in no event is more than $3.00 authorized for each pre-

scription. However, we disagree with the Commissioners and the circuit court in finding that there was a reasonable basis for setting the fees in question.

Section 3 of the Act clearly limits the maximum fee. It provides:

> Each participating pharmacist shall receive a fee equal to the usual and customary dispensing fee as determined by the Department of Social and Rehabilitative Services based upon cost survey, *but in no event shall the fee exceed Two Dollars and Fifty Cents ($2.50) for each prescription filled, plus the Fifty Cents ($.50) per prescription co-payment by the recipient and as funds are available.* The fee shall be reviewed and adjusted annually to reflect changes in the standard cost of living index based on the most recent figures of the U.S. Department of Labor, Bureau of Labor Statistics, and any unusual or unforeseen cost factors. [Emphasis added.]

Evidence was submitted in the way of testimony by members of the General Assembly, when hearings were held there on this Act, which might indicate that it was the intent of the legislature to set the fee at $3.00 with no maximum limit. However, that is not what the Act says. It is clear that the Commissioner has discretion to set the fee at less than $3.00 and in no event shall the fee exceed $3.00.

We have held that:

> The cardinal rule of interpretation is the ascertainment of the meaning of the law-makers as expressed in the language which they have used. Not what the law-makers themselves meant, but what the language they used means. And all rules of interpretation must yield to this as the paramount one. *State ex rel.* v. *Trulock,* 109 Ark. 556, 160 S.W. 516 (1913).

The pharmacists would also have us examine the emergency clause in interpreting this Act, but the Act is clear and plain on its face. We only resort to the emergency clause to resolve doubts in interpretations. *City of Fort Smith* v. *Brewer,* 255 Ark. 813, 502 S.W. 2d 643 (1973).

We conclude that in no event under this Act, at any time, can a commissioner authorize a payment in excess of $3.00.

The basis of a fee to be paid to pharmacists is mentioned in two sections of Act 492. Section 3 states that "Each participating pharmacist shall receive a fee equal to the usual and customary dispensing fee as determined by the Department of Social and Rehabilitative Services based upon cost survey . . . ."

Section 4 of the Act states quite clearly that ". . . drug product costs under this program are to be defined as prevailing local wholesale costs of the manufacturer's 100-unit size or the next smaller size when the 100-unit size is not available."

There were two hearings held on this matter, one in August, 1977 by then Commissioner Scott, and one in February, 1978 by Commissioner Yarborough. The record clearly shows that no survey was made in the State of Arkansas at any time to determine the wholesale costs as mentioned in Section 4. Ms. Debbie Dodson, an employee of the department, testified as follows:

Mr. Pike — I believe you stated in your memo that there had been no formal study done in Arkansas to compare average wholesale price and actual acquisition cost.

Ms. Dodson — Correct.

Mr. Pike — And this Commission again if it is going to base its decision on facts rather than arbitrarily pick figures out of the air, has no figures on which it could arrive at a figure that would show the difference between average wholesale price and actual acquisition cost in Arkansas, does it?

Ms. Dodson — Not at this time, no.

It was Commissioner Scott's position, and that position was confirmed by Commissioner Yarborough, that a study from the State of Iowa regarding wholesale costs was con-

sidered and was used as a basis in determining that the fee should be $2.70. Ms. Dodson testified that at one time a spot check was made of local wholesale costs but to her knowledge this was not used as evidence in setting the fee.

Two witnesses provided evidence on behalf of the pharmacists as to what the usual and customary fee was in Arkansas. However, there is no evidence that either study used wholesale costs, as defined by the Act, in determining what the fee should be. In fact, one of the witnesses said such a study did not exist and, therefore, there was no such information available.

There are, of course, relevant federal regulations which give guidelines as to how one can arrive at the usual and customary fee charged by pharmacists. However, the Arkansas Legislature made it clear that when drug product costs were to be determined, then the prevailing local wholesale costs must be used.

Commissioner Scott testified, and the record reflects that he acted in good faith, that a survey of some 79,000 claims submitted to Blue Cross-Blue Shield Insurance Company was used as one of the bases for setting the fee at $2.70. However, it was undisputed that these were billings by pharmacists and there is no evidence that wholesale costs, as defined by the Act, were taken into consideration.

Therefore, aside from the Iowa study, which he hardly consider "local", there is no evidence that local wholesale costs were used as a criterion in setting the fee at $2.70 or $2.87.

We see no reason to go back beyond the determination made by the Commissioner in August of 1977. The Commissioner used his emergency power to set the fee at $2.70, effective July 1, 1977, and certainly we cannot say this was arbitrary or unreasonable considering the evidence that was available to the Commissioner at that time. (That fee was effective until October 17, 1977.) However, the Commissioner should have had available local wholesale costs before he made his determination after a hearing in August of 1977,

and when a determination was made after the hearing in February of 1978.

Therefore, we must conclude that there was no reasonable basis for the Commissioner's decision to set the fee at $2.70 in August of 1977, or $2.87 in February, 1978. Consequently, these decisions cannot stand.

We do not read the Act in question to mandate that in any event a pharmacist shall receive $3.00. The pharmacist is to be paid the usual and customary fee after a cost survey. The cost survey will be as required in Section 3 of the Act.

Therefore, this matter is remanded so that a hearing may be held to determine what should be the usual and customary fee to be paid the pharmacist from October 17, 1977 until present. The trial court is reinvested with jurisdiction for proceedings not inconsistent with this opinion.

Affirmed in part.

Reversed and remanded in part.